UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Civil Action No. 7:19-CV-00164-D

| | | |
|---|---|---|
| KYLE KOPITKE, GREG BUSCEMI, and WILLIAM CLARK, | ) ) ) | |
| Plaintiffs, | ) | **MEMORANDUM IN SUPPORT** |
| v. | ) ) | **OF DEFENDANT'S MOTION** **TO DISMISS** |
| KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections, | ) ) ) | |
| Defendant. | ) ) | |

Defendant Karen Brinson Bell, in her official capacity as Executive Director of the North Carolina State Board of Elections, respectfully submits this memorandum in support of the Motion to Dismiss the Complaint (Doc. 24).

## NATURE OF THE CASE

Plaintiffs Kyle Kopitke, Greg Buscemi, and William Clark filed this lawsuit alleging that North Carolina's laws governing ballot access for unaffiliated candidates violate the First and Fourteenth Amendments of the U.S. Constitution. (*See* Doc. 1.) Plaintiff Kopitke is running for President of the United States with no party affiliation, and Plaintiff Buscemi is running for Congress in North Carolina's Seventh Congressional District with no party affiliation. (*Id.* ¶¶ 4, 5.) Plaintiff Clark is a voter who wants to cast write-in votes on his ballot. (*Id.* ¶ 6.)

Plaintiffs have sued the executive director of the North Carolina State Board of Elections, Karen Brinson Bell, seeking: (1) a declaratory judgment that North Carolina's laws governing ballot access for unaffiliated candidates are unconstitutional, (2) an injunction prohibiting the State Board from enforcing those laws, (3) an order requiring the State Board to place Plaintiffs

Kopitke and Buscemi on the 2020 general election ballot for president and U.S. House, respectively.  (*Id.* ¶ 36, 40, 53, 63.)

In this motion, Defendant argues:

- Plaintiffs lack standing because: (1) Mr. Clark is not injured by one of the laws under challenge, and his injury with respect to the other law is conjectural; (2) Mr. Kopitke and Mr. Buscemi demonstrate no injury from the filing-fee portion of the ballot access law; and (3) they have not demonstrated that any appropriate mandatory injunctive relief from this lawsuit would remedy their lack of ballot access.

- The Complaint fails to state a claim that North Carolina's laws governing access to the ballot for unaffiliated candidates are unconstitutional because (1) the petition requirement for an unaffiliated candidate to get on the ballot has been upheld by controlling precedent; (2) the "qualified voter" requirement that Mr. Kopitke complains of does not operate the way he alleges; (3) Mr. Buscemi and Mr. Kopitke have not alleged a plausible claim that the filing fee for unaffiliated candidates must be submitted unreasonably early; and (4) no claim regarding the write-in alternative for ballot access is plausible because the law's requirements are minimal.

## STATEMENT OF RELEVANT FACTS

A.   The Plaintiffs.

Plaintiff Kyle Kopitke is a resident of Michigan who "desires to be on the North Carolina ballot as an independent or write-in candidate for President of the United States in the 2020 general election."  (Doc. 1 ¶¶ 4, 24.)  He is not a registered voter in North Carolina.  (*Id.* ¶ 4.) That is all the Complaint says about Mr. Kopitke and his campaign for the presidency of the

United States, a nation of 330 million people. *See* U.S. Census Bureau, *U.S. and World Population Clock*, https://www.census.gov/popclock/.[1]

Plaintiff Greg Buscemi is a registered voter in North Carolina "who desires to be an independent/unaffiliated or write-in candidate for the office of U.S. Representative for North Carolina's 7th District." (Doc. 1 ¶ 5.) That is all the Complaint says about Mr. Buscemi and his campaign to become a congressman representing roughly 800,000 North Carolinians in Washington, D.C. *See* U.S. Census Bureau, *My Congressional District: Congressional District 7, North Carolina*, https://www.census.gov/mycd/?st=37&cd=07.

Plaintiff William Clark is a registered voter in North Carolina who wants to be able to "cast write-in votes for all offices." (Doc. 1 ¶ 6.) He does not allege for whom he would like to cast a write-in vote.

B. North Carolina's Petition Signature Requirement for Unaffiliated Candidates

Plaintiffs challenge N.C. Gen. Stat. § 163A-1005 (2017) (hereinafter the "Unaffiliated Candidate Petition Law"),[2] which governs how an unaffiliated candidate is nominated for placement on the general election ballot in North Carolina. (*Id.* ¶¶ 36, 40.) The law requires a candidate to gather a certain number of petition signatures from voters who could vote for that candidate in the election, before that candidate can appear on the ballot.

---

[1] This Motion supplements the spare allegations in the Complaint with facts in the public record that are not subject to any reasonable dispute. This Court may take judicial notice of such facts when considering a motion to dismiss. *See Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

[2] After the Complaint was filed, the relevant portions of Chapter 163A of the North Carolina General Statutes were recodified into Chapter 163, pursuant to N.C. Sess. Law 2018-146, sec. 3.1.(a). In the interest of clarity, this brief cites to the same sections of Chapter 163A that Plaintiffs cite in the Complaint. Technically, however, the Unaffiliated Candidate Petition Law is now located at N.C. Gen. Stat. § 163-122 (2019 Spec. Supp.), and the write-in law is located at N.C. Gen. Stat. § 163-123.

A statewide candidate like Mr. Kopitke would need to gather signatures from North Carolina voters "equal in number to one and a half percent (1.5%) of the total number of voters who voted in the most recent general election for Governor." N.C. Gen. Stat. § 163A-1005(a)(1). Because 4,769,640 votes were cast for governor in 2016,[3] the petition requirement amounts to 71,545 signatures. (Doc. 1 ¶ 14.) To demonstrate sufficient support in different areas of the state, the law requires that, among those signatures, at least 200 must come from each of three congressional districts in the state. *Id.* This signature requirement was actually reduced in October 2017 from 2% of the statewide vote for governor, with 200 signatures coming from four congressional districts, instead of three. *See* N.C. Sess. Law 2017-214, sec. 2.(a) (attached as Exhibit A).

For a candidate for a district office like Mr. Buscemi, he would need to gather signatures from "qualified voters of the district equal in number to one and a half percent (1.5%) of the total number of registered voters in the district as reflected by the voter registration records of the State Board as of January 1 of the year in which the general election is to be held." *Id.* § 163A-1005(a)(2). It is not yet possible to know the precise number of registered voters in the Seventh Congressional District as of January 1, 2020. But the State Board reported that there were 551,782 registered voters in the district on January 1, 2019,[4] so it is reasonable to estimate that the number of required petition signatures is likely to be close to 8,276, which is 1.5% of the 2019 number. Similar to the statewide-candidate petition requirement, the congressional petition

---

[3] *See* N.C. State Bd. of Elections, *11/08/2016 Official General Election Results*, https://er.ncsbe.gov/?election_dt=11/08/2016&county_id=0&office=COS&contest=1016.

[4] N.C. State Bd. of Elections, *End-of-Year Snapshot*, https://www.ncsbe.gov/Data-Stats/End-of-Year-Snapshot (linking to "Registered Voters by U.S. Congressional District").

4

requirement was also reduced in October 2017. Previously, it required signatures from 4% of the registered voters in the district. *See* N.C. Sess. Law 2017-214, sec. 2.(a).

Plaintiffs Kopitke and Buscemi mainly rest their legal argument for the invalidation of the Unaffiliated Candidate Petition Law on the contention that it requires fewer petition signatures for a new political party to gain recognition in North Carolina than for these Plaintiffs to get their names on the ballot as unaffiliated candidates. (Doc. 1 ¶¶ 20, 26, 38.) That is factually incorrect for Mr. Buscemi, as a matter of public record.

The signature requirement for a new political party is "one-quarter of one percent (0.25%) of the total number of voters who voted in the most recent general election for Governor." N.C. Gen. Stat. § 163A-950(a)(2). Based on the 4,769,640 votes cast for governor in 2016, the new party signature requirement amounts to 11,925. (Doc. 1 ¶ 19.) As noted above, the signature requirement for an unaffiliated candidate for the Seventh Congressional District is likely to be around 8,276. Arithmetically, for Mr. Buscemi's signature requirement to exceed the new party requirement, the number of registered voters in the Seventh Congressional District would have to jump from 551,782 to 795,000 between January 1, 2019, and January 1, 2020—an implausible 30% increase in the number of voters over the course of a single year.

The new party petition law includes some additional requirements. Similar to the statewide candidate petition, the new party petition must be signed by at least 200 registered voters from each of three congressional districts. *Id.* Unlike petitions for unaffiliated candidates, petitions for new political parties must "inform the [petition] signers of the general purpose and intent of the new party." *Id.* § 163A-950(b).

C.  The "Qualified Voter" Requirement for Ballot Access by Petition

Plaintiff Kopitke also challenges the "qualified voter" provision of the Unaffiliated Candidate Petition Law.  The relevant section reads: "Any qualified voter who seeks to have the voter's name printed on the general election ballot as an unaffiliated candidate shall" comply with the signature requirements discussed above.  N.C. Gen. Stat. 163A-1005(a).  Mr. Kopitke contends that this provision restricts unaffiliated candidate ballot access to "someone who satisfies the statutory requirements to vote in North Carolina and has registered to vote." (Doc. 1 ¶ 18.)  He argues that North Carolina may not impose a requirement for candidacy for president that is not found in the U.S. Constitution.  (*Id.* ¶ 34.)

D.  Time Period to Gather Petition Signatures

The Unaffiliated Candidate Petition Law does not explicitly address how long a candidate has to gather petition signatures, and Plaintiffs do not address it in their Complaint.  However, the law requires the petition to include the following language that the signers must agree to:

> THE UNDERSIGNED REGISTERED VOTERS IN _____
> COUNTY HEREBY PETITION ON BEHALF OF _____ AS AN
> UNAFFILIATED CANDIDATE FOR THE OFFICE OF _____ IN
> THE NEXT GENERAL ELECTION.  THE UNDERSIGNED HEREBY
> PETITION THAT SUBJECT CANDIDATE BE PLACED ON THE
> APPROPRIATE BALLOT . . . .

N.C. Gen. Stat. 163A-1005(c) (emphasis added).  By pledging the signers to support the candidate's placement on "the appropriate ballot" "in the next general election," the statute implies that a signature can be valid only when gathered between the last general election for that office and the one for which the candidate is seeking ballot access.  *See Nader 2000 Primary Comm., Inc. v. Bartlett*, 230 F.3d 1353, 2000 WL 1337254, at *1 (4th Cir. 2000) (table decision) (drawing the same conclusion).  For Mr. Kopitke, this means that he has been able to collect petition signatures since the date of the last general election for president, which was November

6

8, 2016. Mr. Buscemi has been able to collect signatures since the date of the last general election for the Seventh Congressional District, which was November 6, 2018.[5]

The deadline for submitting a petition for Mr. Kopitke or Mr. Buscemi's placement on the ballot is the date of the 2020 primary, N.C. Gen. Stat. § 163A-1005(a)(1), (2), which is March 3, 2020, *see id.* § 163A-1251. Accordingly, the law affords Mr. Kopitke a total of 1,212 days to gather sufficient signatures, while Mr. Buscemi will have 484 days.[6] Put another way, the rate of signature collection for the time periods allowed in the law are roughly 59 per day for Mr. Kopitke's campaign, and 17 per day for Mr. Buscemi's campaign.

Despite this length of time to gather signatures, Plaintiffs challenge the date by which petitions must be received for an unaffiliated candidate to appear on the 2020 general election ballot, arguing that it imposes a severe burden. (Doc. 1 ¶¶ 59, 63.) The crux of this claim rests on the fact that prior to 2017, such petitions did not have to be turned in until the "last Friday in June" of the election year. (*Id.* ¶ 57.) Actually, prior to the change in the law on March 23, 2017, the law required unaffiliated candidates to file their petitions with each county board of elections where signatures were obtained fifteen days <u>before</u> the last Friday in June. *See* N.C. Sess. Law 2017-3, sec. 10, § 163-122(a)(1), (2) (attached as Exhibit B). Then, the candidates were required to turn in their petitions to the State Board on the last Friday in June. *See id.* Also, until 2016, North Carolina typically held its general election primaries in May—and sometimes even later. *See* N.C. State Bd. of Elections, *Election Results*, https://www.ncsbe.gov/Election-Results (showing primary dates between 1998 and 2019).

---

[5] *See* N.C. State Bd. of Elections, *Election Results*, https://www.ncsbe.gov/Election-Results (displaying dates of general elections).

[6] Day calculations were made using timeanddate.com, at https://www.timeanddate.com/date/duration.html.

Plaintiffs also contend that the filing fee provision of the Unaffiliated Candidate Petition Law imposes a severe burden, because it allegedly requires them to take some action in December of this year. (Doc. 1 ¶¶ 60–62.) The provision states that any unaffiliated candidate seeking placement on the general election ballot through petition "shall pay a filing fee equal to that provided for candidates for the office in G.S. 163A-979 or comply with the alternative available to candidates for the office in G.S. 163A-980." N.C. Gen. Stat. § 163A-1005(e).

First, there is no filing fee for a presidential candidate like Mr. Kopitke. *See id.* § 163A-979(a) (omitting "President" from offices subject to fee). For a congressional candidate like Mr. Buscemi, the filing fees for that office are established in section 163A-979. That provision separately requires that the filing fee be paid "[a]t the time of the notice of candidacy," *id.* § 163A-979(a), which, for "[c]andidates seeking party primary nominations," occurs between the first Monday in December and the third Friday in December, *id.* § 163A-974(a). But Mr. Buscemi is not seeking a party nomination. Section 163A-1005(e) references the partisan filing fee provision only for the purpose of establishing the <u>amount</u> of the fee, not for the date by which it must be submitted. The filing fee for a congressional candidate is 1% of the annual salary for a U.S. House member, or $1,740. *See* N.C. Gen. Stat. § 163A-979(a); Cong. Research Serv., *Salaries of Members of Congress: Recent Actions and Historical Tables* at 1 (May 17, 2019).[7]

The filing fee provision of the Unaffiliated Candidate Petition Law alternatively allows for a candidate to submit a petition in lieu of payment of filing fees, pursuant to the requirements of section 163A-980. *See* N.C. Gen. Stat. § 163A-1005(e).

---

[7] *Available at* https://fas.org/sgp/crs/misc/97-1011.pdf.

E.  North Carolina's Requirements for Write-in Candidates

Plaintiffs also challenge North Carolina's requirements for counting write-in votes. (Doc. 1 ¶ 53.)  As an alternative to the provision permitting ballot access via petition, an unaffiliated candidate may seek election through a write-in campaign.  For any votes cast for that write-in candidate to count in the official tally, that candidate must first qualify as a recognized write-in candidate by submitting a declaration of intent to be a write-in candidate, accompanied by a petition signed by 500 qualified voters for a statewide office and 250 voters for a district office.  N.C. Gen. Stat. §§ 163A-1006(a)–(c).  The deadline for these filings is 90 days before the general election, *id.* § 163A-1006(c), which lands on August 5, 2020, since the general election occurs on November 3, 2020, *see id.* § 163A-700(c).  A write-in space on the ballot is only required for offices for which a candidate has qualified as a write-in candidate under the provisions described above.  *See id.* § 163A-1112(a)(5).

Plaintiffs contend that these requirements impose unconstitutional burdens on candidates who wish to qualify as write-in candidates.  (Doc. 1 ¶ 53.)  They also argue that the write-in requirements violate the rights of voters by restricting the counting of write-in votes to only those candidates who satisfy the requirements of section 163A-1006.  (*Id.*)

**LEGAL STANDARDS**

A.  Rule 12

A challenge to a party's standing to bring suit implicates the Court's subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458–59 (4th Cir. 2005).  When a defendant mounts a facial attack on a plaintiff's standing—*i.e.*, that the complaint "fails to allege facts upon which to base subject-matter jurisdiction"—the Court takes the factual allegations of the complaint as true and

9

determines whether the allegations demonstrate standing. *Suarez v. Camden Prop. Tr.*, No. 5:18-CV-455-D, 2019 WL 3423427, at *3 (E.D.N.C. July 29, 2019).

A motion to dismiss under Rule 12(b)(6) challenges the legal and factual sufficiency of the complaint. *Suarez*, 2019 WL 3423427, at *4. To survive a motion under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). In considering the motion, the Court construes the facts in the light most favorable to the nonmoving party. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). The Court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.* (citation omitted). "Rather, a plaintiff's factual allegations must nudge his claims beyond the realm of mere possibility into plausibility." *Suarez*, 2019 WL 3423427, at *4 (internal quotation marks, alterations, and citations omitted).

In evaluating a Rule 12(b)(6) motion, the Court considers the allegations in the Complaint and any materials incorporated therein, as well any document submitted by the movant that is "integral to the complaint and there is no dispute about the document's authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). The Court may also take "judicial notice of public records when evaluating a motion to dismiss for failure to state a claim." *Suarez*, 2019 WL 3423427, at *4.

B. Facial Challenge

Plaintiffs' claims are almost entirely facial challenges to state election laws. First, Plaintiffs assert that the Unaffiliated Candidate Petition Law imposes unconstitutional burdens on unaffiliated candidates as written, because (a) the signature requirements in the law are too high as compared to the signature requirement for the recognition of a new political party, (Doc.

1 ¶¶ 16–20, 26–31, 39–40), and (b) the deadline to file to become a petition candidate is too early, (*id.* ¶¶ 55–63).  Second, they claim that the signature requirement in the write-in candidate provision is unconstitutionally burdensome as written.  (*Id.* ¶ 53.)  Third, they claim that the write-in provision is invalid as written because it does not guarantee that a person's vote for a candidate who has not qualified as a write-in candidate will be counted.  (*Id.* ¶¶ 48–49, 52–53.)  The only as-applied challenge is Plaintiff Kopitke's claim that the "qualified voter" provision of the Unaffiliated Candidate Petition Law is unconstitutional as applied to him as a presidential candidate who is not a registered voter in North Carolina.  (*Id.* ¶¶ 22–24, 36.)

Facial challenges are "disfavored" under the law, because they "often rest on speculation."  *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008).  "[T]hey raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'"  *Id.* (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)).  Facial challenges also "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."  *Id.* at 451.

For these reasons, "a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications."  *Id.* at 449 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  A law must be upheld on a facial challenge if it has a "plainly legitimate sweep."  *Id.*  "Exercising judicial restraint in a facial challenge 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.'"  *Id.* at 450 (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)).

## ARGUMENT

I.  PLAINTIFFS LACK STANDING FOR MANY OF THEIR CLAIMS.

To establish Article III standing, a plaintiff must show that "(1) [the plaintiff] has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envd. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

When an alleged injury has not yet occurred, the threatened injury must be "certainly impending;" a mere possibility of injury is "not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Additionally, when a future injury "relies on a highly attenuated chain of possibilities," the threatened injury is not "certainly impending." *Id.* at 410. The Supreme Court has also been "reluctan[t] to endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 414.

Because the Complaint's prayers for relief under each count are made on behalf of "Plaintiffs," (Doc. 1 ¶¶ 36, 40, 53, 63), Defendant assumes that each plaintiff is asserting relief for each claim in the Complaint.

A.  Mr. Clark Lacks Standing Entirely.

Mr. Clark, the voter plaintiff, lacks standing to challenge any aspect of the Unaffiliated Candidate Petition Law, because he has alleged no injury from that law. His alleged injury is limited to his stated desire to vote for write-in candidates "for all offices." (Doc. 1 ¶ 6.) Because he alleges only that he wishes to vote for write-in candidates, he is not injured by a law that permits unaffiliated candidates' names to appear on the ballot.

12

Mr. Clark also lacks standing to challenge the write-in candidacy requirements of N.C. Gen. Stat. § 163A-1006, because he has not alleged that he wishes to vote for any particular write-in candidate. He would only be injured if he cast a vote for a candidate who could not, for some unforeseen reason, qualify under North Carolina's minimal standards for recognized write-in candidates. *See* N.C. Gen. Stat. § 163A-1006(c) (requiring petition signatures of, at most, 500 qualified voters 90 days before the election). In that hypothetical scenario, Mr. Clark's vote for the unqualified write-in candidate would not be tallied in the official results. *See id.* § 163A-1006(f). But Mr. Clark has identified no candidate who would be unable to meet the requirements of the write-in provision. His injury is therefore conjectural and hypothetical. Under *Clapper*, such "allegations of *possible* future injury are not sufficient." 568 U.S. at 409 (quotations omitted; emphasis in original).

Mr. Clark's conjectural injury is similar to other claims of potential injury stemming from election-related events that may or may not occur, which courts have found to not satisfy Article III standing. *See Iowa Right To Life Comm., Inc. v. Tooker*, 717 F.3d 576, 587 (8th Cir. 2013) (no standing where organization feared the state might classify it as a candidate-advocacy group and subject it to campaign-finance restrictions); *Leifert v. Strach*, No. 1:17CV147, 2019 WL 3578721, at *8–9 (M.D.N.C. Aug. 6, 2019) (no standing where plaintiff contended that he wished to affiliate with an unidentified political party that may not be able to comply with North Carolina's party recognition requirements); *Heindel v. Andino*, 359 F. Supp. 3d 341, 353 (D.S.C. 2019) (no standing where voters worried that their votes would not be accurately counted by voting machines that could be subject to hacking); *Koller v. Harris*, 312 F. Supp. 3d 814, 826 (N.D. Cal. 2018) (no standing where a past presidential elector feared he would be compelled to cast his vote for a candidate with whom he disagreed in the 2020 election). His injury also

13

depends on an "attenuated chain of possibilities" and "speculation about the decisions of independent actors" regarding whether any candidate that Mr. Clark may wish to support would comply with the minimal requirements in North Carolina to be recognized as a write-in candidate. *Clapper*, 568 U.S. at 410, 414.

B. Plaintiffs Kopitke and Buscemi Lack Standing to Challenge any Fee-related Deadline.

Plaintiffs contend that the filing fee provision of the Unaffiliated Candidate Petition Law, section 163A-1005(e), is burdensome because it references other statutes that impose December 2019 deadlines on party primary candidates, and those deadlines could apply to Plaintiffs too. (Doc. 1 ¶¶ 60–62.)

Plaintiff Kopitke, who is a presidential candidate, is not injured by § 163A-1005(e), or the other filing fee-related statutes the provision references, because North Carolina law imposes no filing fee on presidential candidates. *See* N.C. Gen. Stat. § 163A-979(a).

Plaintiff Buscemi is not injured by § 163A-1005(e) because it does not impose a December deadline to submit the filing fee, contrary to his legal allegations, (Doc. 1 ¶¶ 61–62). That provision requires unaffiliated candidates seeking ballot access to "pay a filing fee equal to that provided for candidates for the office in G.S. 163A-979," or submit a petition in lieu of paying the fee. N.C. Gen. Stat. § 163A-1005(e). Under its plain language, the filing fee provision of the Unaffiliated Candidate Petition Law references section 163A-979 only to establish the amount of the filing fee. It says nothing about the time for submission. Therefore, it does not impose an injurious deadline on Mr. Buscemi.

Section 163A-979 does impose a filing fee deadline "[a]t the time of filing a notice of candidacy," and cross-references the statute establishing a December 2019 deadline for filing the notice of candidacy, section 163A-974. But that section, by its terms, applies to only

14

"[c]andidates seeking party primary nominations," *id.* § 163A-974(a), which does not describe

Mr. Buscemi. It therefore does not injure Mr. Buscemi. The best reading of the Unaffiliated

Candidate Petition Law, and the practice of the State Board, is to require the filing fee to be paid

once a candidate meets the petition requirements, as certified by the State Board.

Mr. Buscemi is also not injured by the petition-in-lieu-of-fee provision, because he has

not alleged that he is unable to pay the filing fee of $1,740 to run for Congress, nor that he

desires to collect petition signatures rather than pay this filing fee.

C. Plaintiffs Kopitke and Buscemi Lack Standing to Seek Mandatory Injunctive Relief.

Even if injury is properly alleged, a plaintiff still lacks standing if he cannot show that a

"favorable decision" would redress that injury. *Friends of the Earth*, 528 U.S. at 181.

Additionally, standing must be shown "for each form of relief sought." *DaimlerChrysler Corp.

v. Cuno*, 547 U.S. 332, 335 (2006).

The ultimate remedy Plaintiff Kopitke and Buscemi seek—placement on the ballot by

court order—is not a remedy the Court can provide. In ballot access cases involving petition

requirements, courts do not automatically place plaintiffs on the ballot when their claims

succeed. Such a result would absolutely deny the State its "undoubted right to require candidates

to make a preliminary showing of substantial support in order to qualify for a place on the

ballot." *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986) (quoting *Anderson v.

Celebrezze*, 460 U.S. 780, 788–789, n.9 (1983)); *see Jones v. McGuffage*, 921 F. Supp. 2d 888,

902 (N.D. Ill. 2013) (holding that a remedy that placed a candidate on the ballot with no showing

of support "would fly in the face" of the Supreme Court's instructions on the States' compelling

interests). Typically, courts finding violations will reduce the signature requirement to an

amount that, based on the court's review of the evidence, is sufficient to demonstrate the

modicum of support that would satisfy the State's interests in properly regulating elections. *E.g.*, *Libertarian Party of Arkansas v. Thurston*, 392 F. Supp. 3d 973 (E.D. Ark. 2019); *Graveline v. Johnson*, 336 F. Supp. 3d 801, 816 (E.D. Mich. 2018). That would be the only "constitutionally appropriate remedy" for a finding of liability. *Jones*, 921 F. Supp. 2d at 902.

Even if the Court were to provide Plaintiffs this remedy, there are no allegations to demonstrate that Plaintiffs would be able to meet an even lower signature threshold. Plaintiffs do not allege that they have undertaken any effort whatsoever to demonstrate support among voters by collecting petition signatures. Accordingly, Plaintiffs Kopitke and Buscemi lack standing because they have not alleged that a favorable decision, consistent with the law, would make any difference to their quest to appear on the ballot. *See, e.g.*, *Stein v. Cortes*, 223 F. Supp. 3d 423, 433 (E.D. Pa. 2016) (denying standing because plaintiff could not show that an order for a hand recount of election results would result in her prevailing).

## II.  THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF.

### A.  The Unaffiliated Candidate Petition Law Is Constitutional.

Plaintiffs' claim that section 163A-1005 is unconstitutional is foreclosed by precedent.

#### 1.  The *Anderson-Burdick* framework applies.

As an initial matter, the constitutional standard to apply to laws regulating ballot access is the *Anderson-Burdick* framework. *Pisano v. Strach*, 743 F.3d 927, 932–33 (4th Cir. 2014). Under that framework, the Court weighs the "character and magnitude" of the regulation's burden on the plaintiff's rights against the State's interests that justify the regulation, "taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). If the burden on a plaintiff's access to the ballot is severe, the law is

subject to strict scrutiny, which requires a showing that the restrictions are "narrowly drawn to advance a state interest of compelling importance." *Pisano*, 743 F.3d at 933 (quoting *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1220 (4th Cir. 1995)). If the burden is not severe, "then a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (quoting *S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 756 (4th Cir. 2010)). When determining the severity of the burden imposed, the Court must "evaluate the combined effect of the state's ballot-access regulations." *Id.*

      2.   <u>Courts have concluded that the petition requirements are "modest."</u>

Plaintiffs' contention that the Unaffiliated Candidate Petition Law is invalid is foreclosed by controlling precedent that deems petition requirements higher than those in current law to be "modest."

Courts have upheld North Carolina's petition requirements for ballot access, even when those requirements were higher than 1.5% of the gubernatorial vote, or 1.5% of a district's registered voters, which are the relevant threshold under the Unaffiliated Candidate Petition Law. In *Pisano*, 743 F.3d at 934–37, the Fourth Circuit determined that the previous petition requirement for new parties—which required 2% of the gubernatorial vote by a deadline falling ten days after the primary—was constitutional. Prior to that, the Fourth Circuit held that the same 2% requirement—when combined with more onerous requirements that the petition signatures be notarized, the petitioner pay a verification fee of $.05 per signature, and any newly recognized parties earn 10% of the vote in the next election to retain recognition—was constitutional. *McLaughlin*, 65 F.3d at 1225–26.

In *Greene v. Bartlett*, No. 5:08-CV-088-GC, 2010 WL 3326672, at *6 (W.D.N.C. Aug. 24, 2010), the court upheld a signature requirement for unaffiliated district candidates that was

more than double the current requirement: 4% of registered voters.  The Fourth Circuit affirmed

that decision, finding it persuasive that an independent candidate for Congress met the 4%

threshold in 2010, and that over 80 candidates for other district offices had met the requirement

since 1992.  *Greene v. Bartlett*, 449 F. App'x 312, 313 (4th Cir. 2011).  The appellate court also

held that there was "no meaningful way to distinguish" plaintiff's case against the unaffiliated

petition requirement from the Supreme Court's decision in *Jenness v. Fortson*, 403 U.S. 431

(1971), upholding a Georgia law requiring signatures of 5% of registered voters in the last

election, to be gathered within a six-month period.  *Greene*, 449 F. App'x at 313.

As the *Greene* case suggests, these decisions draw upon a long line of decisions that have

upheld petition signature requirements that far exceed the 1.5% thresholds at issue here.  *E.g.*,

*Am. Party of Texas v. White*, 415 U.S. 767, 789 (1974) ("Demanding signatures equal in number

to 3% or 5% of the vote in the last election is not invalid on its face."); *Jenness*, 403 U.S. 431

(upholding a requirement of 5% of all registered voters); *Green Party of Tennessee v. Hargett*,

700 F.3d 816, 824 (6th Cir. 2012) (holding that a 2.5% signature requirement is not facially

unconstitutional); *Swanson v. Worley*, 490 F.3d 894, 912 (11th Cir. 2007) (upholding 3%

requirement with petition deadline on primary day).

Importantly, although the district court in *Greene* determined that the 4% requirement

constituted a severe burden that nonetheless was justified by the State's interests, 2010 WL

3326672, at *4, the Fourth Circuit in *Pisano* determined that the 2% requirement, in combination

with a deadline ten days after the primary, was not a severe burden, 743 F.3d at 935.  The court

focused on "important alleviating factors in North Carolina's statutory framework" for ballot

access, *id.* at 934, almost all of which are relevant here.

First, Plaintiffs have a long time period to gather signatures. *Id.* As noted above, Mr. Kopitke's campaign will have had 1,212 days to gather sufficient signatures (or 59 per day), and Mr. Buscemi's campaign will have had 484 days (or 17 per day), before the March 2020 deadline. Plaintiffs thus have "ample opportunity to collect signatures when voters are engaged, such as during primaries and other elections." *Id.* By contrast, cases that have invalidated ballot access petition requirements have often focused on unreasonably short time restrictions for gathering signatures. *E.g.*, *Breck v. Stapleton*, 259 F. Supp. 3d 1126, 1132–33 (D. Mont. 2017) (46-day period).

Second, Plaintiffs "have a large pool from which to collect signatures, as the state does not preclude voters from signing petitions based on their party affiliation or from signing multiple petitions." *Pisano*, 743 F.3d at 935. Any "qualified voter[]" for the office in question can sign a petition for Mr. Kopitke or Mr. Buscemi. N.C. Gen. Stat. §§ 163A-1005(a)(1), (2). As a statewide candidate, Mr. Kopitke can canvass among 6.7 million voters for their signatures,[8] and as candidate for the Seventh Congressional District, Mr. Buscemi has over 500,000 voters he can approach.[9] Moreover, voter addresses are freely available on the State Board's website.[10]

Third, Plaintiffs can collect signatures "during the height of the primary season," when voters are highly engaged, including during the early voting period. *Pisano*, 743 F.3d at 935.

---

[8] N.C. State Bd. of Elections, *Voter Registration Statistics – Reporting Period: 09/28/2019*, https://vt.ncsbe.gov/RegStat/Results/?date=09%2F28%2F2019.

[9] N.C. State Bd. of Elections, *End-of-Year Snapshot*, https://www.ncsbe.gov/Data-Stats/End-of-Year-Snapshot (linking to "Registered Voters by U.S. Congressional District").

[10] *See* https://dl.ncsbe.gov/index.html?prefix=data/ (including lists of all registered voters by county and statewide).

Although in *Pisano*, the petitions were required to be submitted nine days after the primary, instead of on the day of the primary, the distinction is immaterial because the "height of the primary season" remains available to Plaintiffs for signature collection. *Id.*

Fourth, unlike in other cases that have struck down petition requirements, North Carolina's deadline does not precede the primary election. *Id.* (discussing cases involving deadlines falling 75 or 90 days before the primary). "As the Sixth Circuit has explained, 'the great weight of authority . . . has distinguished between filing deadlines well in advance of the primary and general elections and deadlines falling closer to the dates of those elections." *Id.* (quoting *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 590 (6th Cir. 2006)). Indeed, the Fourth Circuit upheld a West Virginia law requiring petitions to be filed the day <u>before</u> the state's primary, *Fishbeck v. Hechler*, 85 F.3d 162, 165 (4th Cir. 1996), as well as a Virginia law requiring signatures to be filed on the primary day, *Wood v. Meadows*, 207 F.3d 708, 713 (4th Cir. 2000).

In sum, the Fourth Circuit has already decided that "[e]lection law schemes with modest signature requirements and filing deadlines falling close to or after the primary election . . . do not impose severe burdens." *Pisano*, 743 F.3d at 935. Even when North Carolina's signature requirement was higher than 1.5%, the court held that "Plaintiffs ha[d] ample time and opportunity to collect the reasonable number of required signatures," and "the burden on Plaintiffs [was] modest." *Id.* at 936.

      3.   <u>The State's interests justify the modest burden imposed by the law.</u>

Because the burden of the Unaffiliated Candidate Petition Law is not severe, "North Carolina's 'asserted regulatory interests need only be sufficiently weighty to justify the limitation

imposed on the [plaintiffs'] rights.'" *Id.* at 936–37 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997)).

North Carolina's interests at stake are not only weighty, they are compelling. The State has a duty to minimize voter confusion and preserve order in the election process by limiting access to the ballot to candidates who have demonstrated "a significant modicum of support." *Jenness*, 403 U.S. at 442; *see Libertarian Party v. Rednour*, 108 F.3d 768, 774 (7th Cir. 1997) (noting that a State has "a duty to ensure that the electoral process produces order rather than chaos"); *Const. Party of Kansas v. Biggs*, 813 F. Supp. 2d 1274, 1279 (D. Kan. 2011), *aff'd sub nom. Const. Party of Kansas v. Kobach*, 695 F.3d 1140 (10th Cir. 2012) (discussing election officials' "duty to avoid voter confusion, deception, and other possible frustrations of the democratic process."). "[T]he interest of a state in preserving the integrity of the electoral process and regulating the number of candidates to avoid voter confusion is compelling." *New All. Party v. N.C. State Bd. of Elections*, 697 F. Supp. 904, 907 (E.D.N.C. 1988). The Unaffiliated Candidate Petition Law satisfies these goals by requiring unaffiliated candidates to show some support among the electorate before their names are added to the general election ballot. Without such regulations, the ballot would include a laundry list of candidates that have made no inroads with voters during the campaign season, thereby generating voter confusion and frustrating the democratic process. *White*, 415 U.S. at 782 n.14 (collecting cases upholding these "compelling" interests).

The State also has a compelling interest in promoting political stability, which could be undermined by "the destabilizing effects of party-splintering and excessive factionalism." *Timmons*, 520 U.S. at 367; *see also Storer v. Brown*, 415 U.S. 724, 735 (1974) (recognizing a state's interest in discouraging "independent candidacies prompted by short-range political goals,

pique, or personal quarrel"). "By placing reasonable restrictions on ballot access for independent and minor party candidates, [a state's] election scheme discourages party-splintering and factionalism that could destabilize the political system." *Swanson*, 490 F.3d at 911–12.

An unaffiliated candidate petition deadline that coincides with the party primaries also supports the State's interest in focusing voter attention on general election contests after the primary concludes. *Burdick*, 504 U.S. at 439 (recognizing a State's interest in "promot[ing] the two-stage, primary–general election process of winnowing out candidates," which "focuses the attention of voters upon contested races in the general election."). Under North Carolina law, the Congressional candidates who will appear on the general election ballot will be set after the day of the primary election. For presidential candidates, technically the party nominating conventions do not occur until later in the year; but as the Fourth Circuit has recognized, the names of potential recognized-party candidates and their platforms are known well before those dates. *Pisano*, 743 F.3d at 935; *Nader v. Connor*, 332 F. Supp. 2d 982, 991 (W.D. Tex.), *aff'd*, 388 F.3d 137 (5th Cir. 2004) ("It is a simple reality that the selection of presidential candidates occurs much earlier today than in the not too distant past."). In the 2020 general election, for instance, at least 20 states' presidential nominating processes will have concluded by March 3, 2020. *See* Nat'l Conf. of State Legis., *2020 State Primary Election Dates*, http://www.ncsl.org/research/elections-and-campaigns/2020-state-primary-election-dates.aspx.

Likewise, by timing the unaffiliated petition deadline to coincide with the primary, the law also treats party nominees equally to independent candidates. After the primary election, the names on the general election ballot are mostly set. Each of those candidates, then, has the same length of time to focus their campaigns on appealing to the general-election electorate.

When considering the State's asserted interests, the State is not required "to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194–95. Such a requirement "would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action." *Id.* at 195. As noted above, precedent clearly establishes that North Carolina's asserted interests are sufficiently weighty, and indeed compelling. These interests easily justify the "modest" burden imposed by the Unaffiliated Candidate Petition Law. *Pisano*, 743 F.3d at 936.

Accordingly, the allegations in the Complaint, on their face, do not plausibly state a claim that the Unaffiliated Candidate Petition Law is unconstitutional. Due to the numerous decisions that have decided that more onerous signature requirements pose no undue burden, there are no facts that Plaintiffs could develop that would entitle them to relief.

### 4. The lesser burden on new parties does not change the analysis.

Plaintiffs seek to avoid the ample precedent establishing that the signature burden is modest by arguing that, by comparison, the petition requirement to qualify as a new political party is even more modest. (Doc. 1 ¶¶ 19–20, 26, 38.) When the North Carolina legislature reduced the unaffiliated candidate signature requirement from 2% to 1.5% for presidential candidates and from 4% to 1.5% for congressional candidates, it also reduced the signature requirement for a new party to be recognized from 2% to 0.25%. *See* N.C. Sess. Law 2017-214, secs. 1, 2.(a). The implication of Plaintiffs' argument, therefore, is that when the legislature reduced an already-modest burden for unaffiliated candidates, and reduced an already-modest burden for new parties by a greater degree, it somehow transformed the unaffiliated candidates' burden from modest to severe. That argument finds no support in the law.

The relative burdens imposed on unaffiliated candidates and new parties could be relevant, however, to whether the burden is justified under strict scrutiny. *See Delaney v. Bartlett*, 370 F. Supp. 2d 373, 378–79 (M.D.N.C. 2004). Under strict scrutiny, the burden must be "narrowly drawn," after all, to advance a "compelling" interest. *Pisano*, 743 F.3d at 933. When the burden is modest, however, there is no narrow tailoring required in the law. *See Green Party of Georgia v. Kemp*, 106 F. Supp. 3d 1314, 1323 (N.D. Ga. 2015) ("[T]he state does not have to employ the least restrictive alternative . . . ."). Instead, "a State's important regulatory interests will usually be enough to justify" the law. *Id.* (quoting *S.C. Green Party*, 612 F.3d at 756); *see Libertarian Party of Fla. v. State of Fla.*, 710 F.2d 790, 793 (11th Cir. 1983) (explaining that when a burden is not severe, the regulation need only be "a rational way to meet" the State's interest). So even if the State believes that it can serve its interests with a lower petition threshold for new parties, that does not negate the fact that the State's petition threshold for unaffiliated candidates—which has been deemed "modest"—is nonetheless reasonable.

Admittedly, in *Delaney*, the Middle District of North Carolina concluded that the disparate signature requirements for unaffiliated candidates (2% of registered voters, at that time) versus new parties (2% of the last gubernatorial vote, at that time) was relevant to a determination as to the severity of the burden placed on unaffiliated candidates, in addition to being relevant on the question of the justification for that burden. *See* 370 F. Supp. 2d at 378–81. However, the court in *Delaney* did not persuasively explain why the analytically distinct factors of burden and justification under the *Anderson-Burdick* framework should essentially bleed into one another. The court even admitted that the 2% requirement "is not an unconstitutional burden *per se*." *Id.* at 378 (citing *Jenness*, 403 U.S. at 442). Yet the court compared the unaffiliated candidate requirement to the new party requirement to determine

whether the former was "unreasonable," and thereby concluded that the burden "as applied in North Carolina" was severe. *Id.* The court then reviewed the State's justification under strict scrutiny. *Id.* at 378–79. Whether a regulation is reasonable, however, goes to a State's justification, not to the severity of the burden. *Delaney*'s application of the *Anderson-Burdick* framework is therefore flawed and is not entitled to deference.

*Delaney*'s analysis has also been overtaken by the case law. In two cases decided after *Delaney*, the Western District of North Carolina concluded that, regardless of the comparison of signature requirements for unaffiliated candidates and new parties, North Carolina's signature requirements are not unconstitutionally burdensome. *See N.C. Const. Party v. Bartlett*, No. 3:12-CV-00192-GCM, 2013 WL 785353, at *7 (W.D.N.C. Mar. 1, 2013); *Greene*, 2010 WL 3326672, at *6. Both cases were affirmed by the Fourth Circuit on appeal, *Pisano*, 743 F.3d at 934–37; *Greene*, 449 F. App'x at 314, with the Fourth Circuit in *Greene* specifically endorsing the district court's conclusion that unaffiliated candidates and new parties had not been shown to be "similarly situated." Additionally, *Pisano* made clear that the proper level of scrutiny to apply here is not strict scrutiny, contrary to *Delaney*'s conclusion. When strict scrutiny is not applied, the State's important interests are "enough to justify" the modest 1.5% signature requirement. *Pisano*, 743 F.3d at 933.

Numerous other courts have reviewed similar claims regarding disparate signature requirements for new parties and unaffiliated candidates and found them meritless. *See Parker v. Duran*, 180 F. Supp. 3d 851, 859 (D.N.M. 2015) (collecting cases); *Nader*, 332 F. Supp. 2d at 990 (collecting even more cases). The disparate-treatment argument is particularly weak with respect to Mr. Buscemi, who, as an independent congressional candidate, has a lower threshold to meet than a candidate of an unrecognized political party who would like to run for the same

seat.  *See McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1225 (4th Cir. 1995) (noting that new political parties in North Carolina must demonstrate statewide support while unaffiliated district candidates can rely on fewer local voters); *supra* pp. 4–5 (explaining Mr. Buscemi's lower signature threshold compared to new parties under current law).

In sum, the North Carolina legislature's recent decision to reduce, by differing degrees, the already-modest burdens for new party recognition and unaffiliated candidate ballot access did not create an unconstitutional burden on unaffiliated candidates where no such burden existed before.  Any claim otherwise is implausible.

B.  The "Qualified Voter" Provision Does Not Apply to Mr. Kopitke.

Plaintiff Kopitke fails to state a claim that the "qualified voter" provision of the statute governing unaffiliated candidate ballot access is invalid because it imposes a requirement to run for President not found in the U.S. Constitution.

The relevant section reads: "Any qualified voter who seeks to have the voter's name printed on the general election ballot as an unaffiliated candidate shall" comply with the signature requirements discussed above.  N.C. Gen. Stat. 163A-1005(a).  Mr. Kopitke contends that this provision restricts unaffiliated candidate ballot access to "someone who satisfies the statutory requirements to vote in North Carolina and has registered to vote."  (Doc. 1 ¶ 18.)  Mr. Kopitke does not explain where the statutes defines "qualified voter" this way.  In fact, the election statutes suggest that "qualified voter" and "registered voter" mean different things because they appear in juxtaposition to one another in various places.  *See* N.C. Gen. Stat. §§ 163A-1005(a)(1)a, b; *id.* § 163A-1006(c)(1).  The state constitution confirms that these are distinct concepts.  Article VI, Section 2 addresses the "Qualifications to Vote," which do not include registration, while Section 3 addresses separately the "Registration" requirements.

Additionally, when read in the context of the entire Unaffiliated Candidate Petition Law, it becomes clear that the "qualified voter" language would not prohibit Mr. Kopitke's petition from being considered. Subsection (d) of the law addresses the State Board's authority to reject an unaffiliated candidate's petition based on the candidate's "qualifications." It states that the "board of elections shall, immediately upon receipt of the petition, inspect the registration records of the county and cancel the petition of any person who does not meet the constitutional or statutory qualifications *for the office*, including residency." N.C. Gen. Stat. § 163A-1005(d) (emphasis added). The State of North Carolina does not impose any qualifications "for the office" of President of the United States. Those qualifications are stated in the federal Constitution.

In any event, whatever "qualified voter" is intended to mean with respect to a petitioner seeking to run for president, North Carolina has never read that provision to place a requirement on presidential candidates that is not found in the U.S. Constitution. For example, when Ross Perot qualified for the North Carolina ballot in 1992, *see Delaney*, 370 F. Supp. 2d at 378 n.11, the "qualified voter" language in then-section 163-122(a) was no impediment to the non-North Carolinian running for president as an independent, *see* N.C. Sess. Law 1991-297 (showing "qualified voter" language appeared in statute prior to 1992 election) (attached as Exhibit C).

Accordingly, the claim regarding the "qualified voter" phrase in section 163A-1005(a) is a red herring.

C. No Claim Regarding the Filing Fee Requirement Is Plausible.

As explained above, neither Mr. Kopitke nor Mr. Buscemi have standing to challenge the filing fee requirements of the Unaffiliated Candidate Petition Law. *Supra* pp. 14–15. Mr. Kopitke, as a presidential candidate, is not required to pay any filing fee. *See* N.C. Gen. Stat. §

163A-979(a).  As for Mr. Buscemi, even if the Court concludes that he has standing, his claim

for entitlement to relief is implausible based on his spare allegations.  Mr. Buscemi has not

alleged that he is unable to pay the filing fee of $1,740.  The District of South Carolina found a

similar claim to be meritless "because [plaintiff] has not alleged an inability to pay the filing fee,

but has instead expressed an unwillingness to do so."  *Coyne v. S.C. Sec'y of State*, No. CV 3:15-

3669-JFA-SVH, 2016 WL 4544364, at *6 (D.S.C. July 26, 2016), *report and recommendation

adopted*, 2016 WL 5424755 (D.S.C. Sept. 29, 2016).  Additionally, contrary to his allegations,

Mr. Buscemi is not required to pay the filing fee at the time of primary candidate filing, as

explained above.  *Supra* pp. 14–15.  His allegations therefore demonstrate no undue burden with

respect to the filing fee provision, section 163A-1005(e).

     D.   The Write-in Provision Is Constitutional Because Its Burden Is *De Minimis*.

Plaintiffs contend, without explanation, that requirements to qualify to be a write-in

candidate under section 163A-1006 impose unconstitutional burden.  (Doc. 1 ¶ 53.)  That

provision requires only that a candidate submit a declaration of intent to be a write-in candidate,

accompanied by a petition signed by 500 voters for a statewide office and 250 voters for a

congressional office.  N.C. Gen. Stat. §§ 163A-1006(a)–(c).  The deadline for these filings is 90

days before the general election, *id.* § 163A-1006(c), which is August 5, 2020 for the upcoming

election, *see id.* § 163A-700(c).  This burden is unquestionably *de minimis*, and any claim

otherwise is implausible.

Additionally, beyond the fact that Plaintiff Clark's potential injuries as a voter from the

write-in provision are entirely speculative, *supra* pp. 13–14, the Supreme Court has determined

that an outright ban on write-in voting would not impose an unconstitutional burden on voters,

*see Burdick*, 504 U.S. at 439–40.  Any claim by Mr. Clark that a law <u>permitting</u> him to cast a write-in vote, however restricted it may be by section 163A-1006, is implausible.

As indicated in Plaintiffs' brief supporting a preliminary injunction, Mr. Clark may rely on the Fourth Circuit's decision in *Dixon v. Md. State Admin. Bd. of Election Laws*, 878 F.2d 776 (4th Cir. 1989). (*See* Doc. 15 at 17.)  That case is both factually distinct and legally helpful to the State.  *Dixon* dealt with a candidate's challenge to Maryland's law that imposed the same <u>filing fee</u> on write-in candidates as for candidates that appeared on the ballot.  *Id.* at 777.  The Fourth Circuit concluded that the filing fee was unjustified because the payment of money is a poor indication of a candidate's seriousness or support among voters.  *Id.* at 784.  The court cited the Supreme Court's decision in *Lubin v. Panish* to conclude there are "other 'obvious and well-known' means of testing candidates' seriousness."  *Id.* (quoting *Lubin v. Panish*, 415 U.S. 709, 718 (1974)).  Among the means suggested by *Lubin* was requiring a candidate to "persuad[e] a substantial number of voters to sign a petition in his behalf."  415 U.S. at 718–19.  *Dixon*'s reasoning, therefore, undoubtedly supports North Carolina's imposition of the modest petition requirement for a write-in candidate's votes to be tallied.  Indeed, 500 voters across the state or 250 voters in a congressional district would not even qualify as a "substantial number of voters."

In addition to the fact that *Dixon*'s reasoning supports the constitutionality of North Carolina's write-in qualifications, the case's invalidation of the write-in filing fee may no longer be good law.  In *Burdick*, which upheld Hawaii's total ban on write-in voting, the Supreme Court stated that it was resolving a circuit split between the Fourth Circuit's decision in *Dixon* and the Ninth Circuit's decision on appeal, which expressly declined to follow *Dixon*.  *See Burdick*, 504 U.S. at 432.  *Burdick* resolved the circuit split by affirming the Ninth Circuit's decision.  *Id.* at 442.

Accordingly, there is no plausible claim that North Carolina's law governing write-in candidates imposes an undue burden on candidates or voters.

## <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed entirely.

This the 1st day of October, 2019.

JOSHUA H. STEIN
Attorney General

/s/ Paul M. Cox
Paul M. Cox
N.C. State Bar No. 49146
Special Deputy Attorney General
N.C. Dept. of Justice
Post Office Box 629
Raleigh, NC 27602
Telephone: (919) 716-6900
Facsimile: (919) 716-6920
Email: pcox@ncdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing document with the clerk of Court using the CM/ECF system which will send notification of such to all counsel of record in this matter.

This the 1st day of October, 2019.

/s/ Paul M. Cox
Paul M. Cox
Special Deputy Attorney General