UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Civil Action No. 7:19-CV-00164-D

| | |
|---|---|
| KYLE KOPITKE, GREG BUSCEMI, and WILLIAM CLARK, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina State Board of Elections, | ) ) ) ) ) |
| Defendant. | ) |

**RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION**

Defendant Karen Brinson Bell, in her official capacity as Executive Director of the North Carolina State Board of Elections, respectfully submits this response in opposition to Plaintiffs' Motion for Preliminary and Permanent Injunction (Doc. 12).

## NATURE OF THE CASE

Plaintiffs Kyle Kopitke, Greg Buscemi, and William Clark filed this lawsuit alleging that North Carolina's laws governing ballot access for unaffiliated candidates violate the First and Fourteenth Amendments of the U.S. Constitution. (*See* Doc. 1.) Plaintiff Kopitke is running for President of the United States with no party affiliation, and Plaintiff Buscemi is running for Congress in North Carolina's Seventh Congressional District with no party affiliation. (*Id.* ¶¶ 4, 5.) Plaintiff Clark is a voter who wants to cast write-in votes on his ballot. (*Id.* ¶ 6.)

Plaintiffs have sued the executive director of the North Carolina State Board of Elections, Karen Brinson Bell, claiming that North Carolina's laws governing ballot access for unaffiliated candidates are unconstitutional. Defendant Bell has moved to dismiss the Complaint in its

entirety, based on lack of subject-matter jurisdiction and failure to state any claims for relief. (Doc. 24, 25.) The time for Plaintiffs' response to the Motion to Dismiss has not yet concluded.

Plaintiffs have moved for preliminary and permanent injunctions prohibiting the enforcement of these laws and ordering Plaintiffs Kopitke and Buscemi to be placed on the 2020 general election ballot for president and U.S. House, respectively. (Doc. 15 at 25.) In this response to the Motion for Preliminary and Permanent Injunction, Defendant argues:

- As demonstrated in the Motion to Dismiss, Plaintiffs cannot demonstrate a likelihood of success on the merits because they lack standing to assert many of their claims, and none of their claim are legally plausible. Plaintiffs' spare factual submissions with their Motion do not change the analysis.

- Any harm that Plaintiffs may experience results from their decision to do nothing, according to the record before the Court, to attempt to comply with the signature requirements for ballot access in North Carolina.

- The interests of the State, which are aligned with the public interest, favor a denial of the relief requested by Plaintiffs—invalidation of state laws and the automatic placement of Plaintiffs on the ballot. The injunction requested by Plaintiffs would thwart the long-recognized interest of the State in requiring candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot.

## STATEMENT OF RELEVANT FACTS

Plaintiff Kopitke is an unaffiliated candidate for President of the United States, Plaintiff Buscemi is an unaffiliated candidate for North Carolina's Seventh Congressional District, and Plaintiff Clark is a voter who wants to cast write-in votes on his ballot. (Doc. 1 ¶¶ 4–6.)

A. <u>Unaffiliated Candidate Petition Law</u>

Plaintiffs challenge N.C. Gen. Stat. § 163A-1005 (2017) (hereinafter the "Unaffiliated Candidate Petition Law"),[1] which governs how an unaffiliated candidate is nominated for placement on the general election ballot in North Carolina. (*Id.* ¶¶ 36, 40.) The law requires a candidate to gather a certain number of petition signatures from voters who could vote for that candidate in the election, before that candidate can appear on the ballot. Mr. Kopitke must gather signatures equaling 1.5% of the number of votes cast in the most recent gubernatorial election, or 71,545 signatures. N.C. Gen. Stat. § 163A-1005(a)(1). Mr. Buscemi must gather signatures equaling 1.5% of the registered voters in his congressional district as of January 1, 2020, *id.* § 163A-1005(a)(2), which is estimated to be around 7,805 signatures based on the State Board's most recent voter registration count for the Seventh Congressional District, which is 520,282. (Neesby Decl. ¶ 2.) These signature requirements were actually reduced in October 2017 from 2% of the statewide vote for governor for a candidate like Mr. Kopitke, and 4% of registered voters in a district for a candidate like Mr. Buscemi. *See* N.C. Sess. Law 2017-214, sec. 2.(a) (attached as Exhibit 1).

Plaintiffs mainly rest their legal argument for the invalidation of the Unaffiliated Candidate Petition Law on the contention that fewer petition signatures are required for a new political party to gain recognition in North Carolina than for these Plaintiffs to get their names on

---

[1] After Plaintiffs' Motion was filed, the relevant portions of Chapter 163A of the North Carolina General Statutes were recodified into Chapter 163, pursuant to N.C. Sess. Law 2018-146, sec. 3.1.(a). In the interest of clarity, this brief cites to the same sections of Chapter 163A that Plaintiffs cite in their Motion and brief. Technically, however, the Unaffiliated Candidate Petition Law is now located at N.C. Gen. Stat. § 163-122 (2019 Spec. Supp.), and the write-in law is located at N.C. Gen. Stat. § 163-123.

the ballot as unaffiliated candidates. (Doc. 15 at 6.) That is factually incorrect as to Mr. Buscemi.

The signature requirement for a new political party is "one-quarter of one percent (0.25%) of the total number of voters who voted in the most recent general election for Governor," N.C. Gen. Stat. § 163A-950(a)(2), which amounts to 11,925 signatures. (Doc. 1 ¶ 19.) As noted above, the signature requirement for an unaffiliated candidate for the Seventh Congressional District is likely to be around 7,805. Arithmetically, for Mr. Buscemi's signature requirement to exceed the new party requirement, the number of registered voters in the Seventh Congressional District would have to jump from 520,282 to 795,000 between October 1, 2019, and January 1, 2020—an implausible 53% increase in the number of voters over the course of three months.

The new party petition law includes requirements that do not apply to unaffiliated candidates. A new party petition must be submitted to each county board of elections in which signatures were collected, *id.* § 163A-950(c), and new party petition circulators must "inform the [petition] signers of the general purpose and intent of the new party." *Id.* § 163A-950(b). Unaffiliated candidates for statewide or congressional offices file directly with the State Board and need not provide any information to voters about their platform in order to obtain signatures.

Plaintiffs also challenge the "qualified voter" provision of the Unaffiliated Candidate Petition Law, which reads: "Any qualified voter who seeks to have the voter's name printed on the general election ballot as an unaffiliated candidate shall" comply with the signature requirements discussed above. N.C. Gen. Stat. 163A-1005(a). Mr. Kopitke contends that this provision restricts unaffiliated candidate ballot access to registered voters in North Carolina, which he is not. (Doc. 15 at 14.) However, the "qualified voter" provision was no impediment

4

to unaffiliated candidate Ross Perot, who successfully petitioned to get on the 1992 general election ballot. *See Delaney v. Bartlett*, 370 F. Supp. 2d 373, 378 n.11 (M.D.N.C. 2004). And the signature requirement at that time was much higher for statewide candidates: "two percent (2%) of the <u>total number of registered voters</u> in the State." N.C. Sess. Law 1991-297 (attached as Exhibit 2).[2]

Plaintiffs also challenge the deadline to submit petition signatures, which is the date of the primary election before the next general election, or March 3, 2020. *See* N.C. Gen. Stat. § 163A-1005(a)(1), (2); *id.* § 163A-1251. But the law permits ample time for signature collection, as indicated by the language of the petition itself. The law requires petition signers to agree to support the petitioner's appearance on "THE APPROPRIATE BALLOT" "IN THE NEXT GENERAL ELECTION." *Id.* § 163A-1005(c). The statute thus implies that a signature can be valid when gathered between the last general election for that office and the one for which the candidate is seeking ballot access. *See Nader 2000 Primary Comm., Inc. v. Bartlett*, 230 F.3d 1353, 2000 WL 1337254, at *1 (4th Cir. 2000) (unpublished) (drawing the same conclusion).

The last general election for president was November 8, 2016, and the last general election for the Seventh Congressional District was November 6, 2018.[3] Accordingly, Mr. Kopitke has a total of 1,212 days to gather sufficient signatures, while Mr. Buscemi has 484

---

[2] Because voter turnout in presidential election years typically falls between 58% and 70% of registered voters, a signature requirement based on a percentage of registered voters will always be much higher than a requirement based upon voter participation in a gubernatorial election. *See* N.C. State Bd. of Elections, *Voter Turnout*, https://www.ncsbe.gov/voter-turnout.

[3] *See* N.C. State Bd. of Elections, *Election Results*, https://www.ncsbe.gov/Election-Results (displaying dates of general elections).

5

days.[4]  Put another way, the rate of signature collection for the time periods allowed in the law are roughly 59 per day for Mr. Kopitke's campaign, and 17 per day for Mr. Buscemi's campaign.

Despite this length of time to gather signatures, Plaintiffs contend that the North Carolina legislature imposed an unconstitutional burden when they moved the deadline from June to March. (Doc. 15 at 20–24.) However, until 2016, North Carolina typically held its general election primaries (presidential years and otherwise) in May, not in March—and sometimes even later. *See* N.C. State Bd. of Elections, *Election Results*, https://www.ncsbe.gov/Election-Results (showing primary election dates between 1998 and 2019). The legislature thus moved the signature deadline to continue to align with the primary election.

Plaintiffs also contend that the filing fee provision of the Unaffiliated Candidate Petition Law imposes a severe burden, because it allegedly requires them to take some action in December of this year. (Doc. 12 ¶ 18.) The provision states that any unaffiliated candidate seeking placement on the general election ballot through petition "shall pay a filing fee equal to that provided for candidates for the office in G.S. 163A-979 or comply with the alternative available to candidates for the office in G.S. 163A-980." N.C. Gen. Stat. § 163A-1005(e). But there is no filing fee for a presidential candidate like Mr. Kopitke. *See id.* § 163A-979(a). For a congressional candidate like Mr. Buscemi, the Unaffiliated Candidate Petition Law incorporates only the amount of the filing fee as listed in section 163A-979, not the deadline to pay those fees, which only applies to partisan primary candidates. *See id.* § 163A-974(a). The filing fee for a congressional candidate is 1% of the annual salary for a U.S. House member, or $1,740. *See*

---

[4]  Day calculations were made using timeanddate.com, at https://www.timeanddate.com/date/duration.html.

6

N.C. Gen. Stat. § 163A-979(a); Cong. Research Serv., *Salaries of Members of Congress: Recent Actions and Historical Tables* at 1 (May 17, 2019).[5]

The filing fee provision of the Unaffiliated Candidate Petition Law alternatively allows for a candidate to submit a petition in lieu of payment of filing fees, pursuant to the requirements of section 163A-980. *See* N.C. Gen. Stat. § 163A-1005(e).

B. <u>Write-in Candidate Requirements</u>

An unaffiliated candidate may alternatively seek election through a write-in campaign. That candidate must first qualify as a recognized write-in candidate by submitting a declaration of intent to be a write-in candidate, accompanied by a petition signed by 500 qualified voters for a statewide office and 250 voters for a district office. *Id.* §§ 163A-1006(a)–(c). The deadline for these filings is 90 days before the general election, *id.* § 163A-1006(c), which lands on August 5, 2020, since the general election occurs on November 3, 2020, *see id.* § 163A-700(c). A write-in space on the ballot is only required for offices for which a candidate has qualified as a write-in candidate under the provisions described above. *See id.* § 163A-1112(a)(5).

Plaintiffs contend that these requirements impose unconstitutional burdens on candidates who wish to qualify as write-in candidates and on voters who wish to vote for unqualified write-in candidates. (Doc. 16 at 16–17.) They also argue that the write-in requirements violate the rights of voters by restricting the counting of write-in votes to only those candidates who satisfy the requirements of section 163A-1006. (*Id.*)

---

[5] *Available at* https://fas.org/sgp/crs/misc/97-1011.pdf.

C. Plaintiffs' Public Filings

Based on records maintained by the Federal Election Commission (FEC), Mr. Kopitke was a candidate for president in 2016 as well. (Love Decl. ¶ 8 & Ex. E.) Earlier this year, he filed paperwork to run again in 2020. (*Id.* Ex. G.) He first notified the State Board of his intent to qualify as an unaffiliated candidate on the 2020 general election ballot on June 4, 2019. (*Id.* ¶ 6 & Ex. C.) The State Board has received no information regarding Mr. Kopitke's progress in gathering signatures to demonstrate any support in North Carolina. (*See id.* ¶ 5 & Ex. C.)

It appears that neither Mr. Buscemi nor any affiliated campaign committee has filed any paperwork with the FEC. (*See id.* ¶ 8.) He first notified the State Board of his intent to qualify for the 2020 ballot on April 2, 2019. (*Id.* ¶ 7 & Ex. D.) The State Board has received no information regarding his progress in gathering signatures to demonstrate any support in North Carolina. *See id.* Ex. D.

In their Motion for Preliminary or Permanent Injunction, Mr. Kopitke and Mr. Buscemi offer no evidence of any efforts by them or anyone supporting them to qualify for the ballot in North Carolina—not counting the filing of this lawsuit. In fact, there is no evidence that Plaintiffs have made any attempts to collect signatures from North Carolina voters. For that matter, Mr. Kopitke, who wishes to be President of the United States, has offered no evidence of his campaign efforts in any U.S. state or territory.

**LEGAL STANDARDS**

A. Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 674 (2008) (citations omitted). A movant must establish each of four elements before a preliminary injunction may issue: (1) he is likely to succeed on the merits; (2) he is likely to

suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Counsel, Inc.*, 555 U.S. 7, 20 (2008). Mandatory preliminary injunctions, such as the one sought by Plaintiffs, do not preserve the status quo and are only granted in particularly exigent. *See E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 828 (4th Cir.), *cert. denied*, 543 U.S. 978 (2004); *Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980).

B. Permanent Injunction

The standard for issuing a permanent injunction tracks the same factors as in the preliminary injunction standard, except a permanent injunction requires "actual success" on the merits, rather than a mere likelihood of success. *Winter*, 555 U.S. at 32 (citing *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987)). "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Id.*

C. Facial Challenge

Plaintiffs' claims are almost entirely facial challenges to state election laws. First, Plaintiffs assert that the Unaffiliated Candidate Petition Law imposes unconstitutional burdens on unaffiliated candidates as written, because (a) the signature requirements in the law are too high as compared to the signature requirement for the recognition of a new political party, (Doc. 1 ¶¶ 16–20, 26–31, 39–40), and (b) the deadline to file to become a petition candidate is too early, (*id.* ¶¶ 55–63). Second, they claim that the signature requirement in the write-in candidate provision is unconstitutionally burdensome as written. (*Id.* ¶ 53.) Third, they claim that the write-in provision is invalid as written because it does not guarantee that a person's vote for a candidate who has not qualified as a write-in candidate will be counted. (*Id.* ¶¶ 48–49, 52–53.) The only as-applied challenge is Plaintiff Kopitke's claim that the "qualified voter" provision of

9

the Unaffiliated Candidate Petition Law is unconstitutional as applied to him as a presidential candidate who is not a registered voter in North Carolina. (*Id.* ¶¶ 22–24, 36.)

Facial challenges are "disfavored" under the law, because they "often rest on speculation." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). "[T]hey raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Id.* (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)). Facial challenges also "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.

For these reasons, "a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Id.* at 449 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). A law must be upheld on a facial challenge if it has a "plainly legitimate sweep." *Id.* "Exercising judicial restraint in a facial challenge 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.'" *Id.* at 450 (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)).

## ARGUMENT

I. PLAINTIFFS' CLAIMS ARE MERITLESS.

As explained in Defendant's brief in support of the Motion to Dismiss, Plaintiffs' claims are without merit, even taking as true all the allegations in the Complaint. (*See* Doc. 25.) Defendant incorporates the arguments in support of the Motion to Dismiss here, rather than restating them. To summarize:

10

- Mr. Clark, the voter plaintiff, lacks standing to challenge any aspect of the Unaffiliated Candidate Petition Law, because he has alleged no injury from that law. He also lacks standing to challenge the write-in candidate provision because he has identified no candidate that he wishes to vote for who could not qualify under North Carolina's relaxed write-in qualifications. (*Id.* at 12–14.)

- Plaintiff Kopitke, who is a presidential candidate, lacks standing to challenge any filing fee-related provision because, as a presidential candidate, those provisions don't apply to him. (*Id.* at 14.)

- Plaintiff Buscemi lacks standing to challenge the filing fee provision because, contrary to his argument, it does not impose a December deadline to submit the filing fee. Moreover, Mr. Buscemi has not alleged that he cannot pay the filing fee or intends to employ the petition option in lieu of the fee, so any deadline for the petition alternative does not injure him either. (*Id.* at 14–15.)

- Plaintiffs Kopitke and Buscemi lack standing to seek any mandatory injunction from the Court. They seek an order placing them on the ballot, but that is not a remedy this Court can constitutionally provide. The alternative mandatory remedy, a reduction in the signature requirement, would not redress Plaintiffs' injuries because they've neither alleged nor shown any effort to gather any meaningful number of signatures. (*Id.* at 15–16.)

- On the merits, Plaintiffs' claims that the Unaffiliated Candidate Petition Law is unconstitutionally burdensome are foreclosed by precedent. Multiple decisions by the Fourth Circuit and North Carolina district courts have upheld prior petition requirements that were more onerous than the current law. As the court recognized in

11

*Pisano v. Strach*, 743 F.3d 927, 935 (4th Cir. 2014), there are "important alleviating factors" in North Carolina law that result in a burden that is "modest" rather than severe. These include: (1) a long time period, relative to other states, to gather signatures; (2) an unrestricted pool of registered voters to gather signatures from; (3) a petition deadline that permits signature gathering during the height of the primary season; and (4) a petition deadline that does not significantly predate the primary. (Doc. 25 at 17–20.)

- North Carolina's compelling interests amply justify the modest signature requirement. These include: (1) minimizing voter confusion; (2) preserving order in the election process by limiting ballot access to candidates who have demonstrated a significant modicum of support; (3) promoting the orderly two-phase, primary–general election schedule; and (4) treating unaffiliated candidates similarly to party nominees by affording the same amount of time to focus on the general electorate. (*Id.* at 20–23.)

- Plaintiffs' argument that the lower signature requirement for new party recognition somehow creates a constitutional burden is deeply flawed. The implication of their argument is that when the legislature reduced an already-modest burden for unaffiliated candidates, and reduced an already-modest burden for new parties by a greater degree, it somehow transformed the unaffiliated candidates' burden from modest to severe. Ample case law supports state ballot laws that have different thresholds for new party recognition versus the placement of an unaffiliated candidate on the ballot. Moreover, because the burden on Plaintiffs is modest in the first place, the State's regulations need not be narrowly tailored to meet the State's interests.

- Where a State's interests reasonably justify modest ballot regulations, as here, they must be upheld. (*Id.* at 23–26.)

- Mr. Kopitke's argument that the "qualified voter" language in the Unaffiliated Candidate Petition Law is unconstitutional fails because it ignores other statutory language and the State's history of interpreting the statute. His Michigan residency will not plausibly keep him off the presidential ballot in North Carolina. (*Id.* at 26–27.) The real challenge for him is showing a significant modicum of support among the state's voters to earn a place on the ballot.

- Plaintiffs' claims regarding the filing fee provision of the Unaffiliated Candidate Petition Law fail because: (1) Mr. Kopitke pays no fee as a presidential candidate; and (2) Mr. Buscemi misinterprets the deadline for submitting his fee and has not alleged that he is unable to pay the 1% of congressional salary required in the law. (*Id.* at 27–28.)

- Any claim regarding the write-in candidate law finds no legal support. The law's requirements for a write-in candidate's votes to be tallied are unquestionably minimal. And where the Supreme Court has permitted a total ban on write-in voting, North Carolina's reasonable regulation that permits write-in voting cannot be unconstitutional. (*Id.* at 28–30.)

In sum, Plaintiffs' claims fail on the pleadings.

The two declarations that Plaintiffs offer in support of their Motion for Preliminary and Permanent Injunction do not resolve the legal deficiencies of their claims.

Mr. Koptike's declaration does not indicate that the petition burdens are too high; it instead indicates that Mr. Kopitke would rather not try to meet the petition requirement. He says

13

nothing about any effort he has made to recruit volunteers or raise money, two critical efforts that are necessary for generating support as a presidential candidate. (*See* Doc. 13-1.) He does not even state that he's collected a single petition signature. Instead, he has concluded that recruiting volunteers to gather petitions would be "an exercise in futility," and raising sufficient funds to pay petition collectors would be "wholly impracticable." (*Id.* at 2.) Plaintiffs offered no evidence at all regarding Mr. Buscemi's campaign, leaving Defendant to conclude that Mr. Buscemi has likewise decided not to make any effort to comply with the law.

Mr. Winger's declaration, while attempting to show that North Carolina's petition requirement is an outlier, does not actually compare that requirement to other states' requirements. (*See* Doc. 14-1 at 4–5.) It is telling that, in contrast to this declaration, in a prior case involving a then-higher North Carolina signature requirement, Mr. Winger did compare requirements among the states to conclude that North Carolina's requirement was unfairly high. See *Greene v. Bartlett*, No. 5:08-CV-088-GC (W.D.N.C.), Doc. 32-3 at ¶¶ 5–6 (Decl. of Richard Winger) (attached as Exhibit 3).[6] So Mr. Winger's conclusion here that the challenged law imposes a *relatively* severe burden, in light of his lack of comparison of signature requirements, is highly questionable. The prime focus of his declaration, instead, is to challenge the federal courts' longstanding consideration of the percentage of signatures required to determine whether the burden on a petition candidate is unjustified. (Doc. 14-1 at 5 (criticizing "[a]lmost every case relating to ballot access" for focusing on the signature percentage, which in his view is "irrelevant" to the burden). He instead favors a bright-line analysis based on a raw number of

---

[6] Even there, however, the court did not agree that North Carolina's then-higher signature requirement was unconstitutional. *See Greene*, 2010 WL 3326672, at *7 (W.D.N.C. Aug. 24, 2010), *aff'd*, 449 F. App'x 312 (4th Cir. 2011).

14

5,000 signatures, no matter the size of the state. (*Id.* at 5 & Ex. A.) Mr. Winger's views on the matter, however, cannot rewrite the law, which has long held that signature requirements higher than those in the Unaffiliated Candidate Petition Law are valid. (*See* Doc. 25 at 17–20.)

Accordingly, Plaintiffs have not shown a likelihood of success on the merits, as is required for a court to issue an injunction.

II. ANY IRREPARABLE HARM WOULD BE THE RESULT OF PLAINTIFFS' INACTION.

Where the potential for irreparable harm results from plaintiff's own actions, as here, equity does not favor an injunction against the defendant. *See Nader 2000 Primary Committee, Inc., v. Bartlett*, No. 5:00-CV-348-BR3, at 11 (E.D.N.C. Aug. 9, 2000) (attached as Exhibit 4), *aff'd* 230 F.3d. 1353 (2001).

In *Nader 2000*, this district faced a similar situation in the 2000 general election, when it considered a motion from the Ralph Nader campaign to have his name placed on the ballot as the Green Party nominee. The record in that case showed that Nader's campaign had expended little effort even attempting to comply with that statute's requirements. In addressing the question of harm to the plaintiffs, Judge Britt concluded:

> The court has examined the efforts made by the Campaign and the Party to comply with the statute that plaintiffs have challenged in an effort to inform its assessment of the harms alleged by plaintiffs in support of the preliminary injunction they seek. The court finds that harms sustained by plaintiffs as a result of their own conduct and decision-making should not be attributed to this court's failure to enter a preliminary injunction on their behalf. The court simply cannot countenance a situation in which the Green Party or any other party deliberately chooses not to commit the resources necessary to comply with North Carolina's law, or even to make a good faith attempt to do so, and instead chooses to litigate to achieve its desired end, a place on the ballot.

*Id*.

15

Plaintiffs in this case, likewise, have offered no evidence that they have even "ma[d]e a good faith attempt" to comply with North Carolina law. *Id.* No exhibit offered by Plaintiffs demonstrates any effort to collect signatures. Instead, the declaration of Plaintiff Kopitke essentially admits that his strategy is the same as the Nader campaign's in 2000. Mr. Kopitke does not show that he has recruited any volunteers or raised any money, (*See* Doc. 13-1.), two critical efforts that are necessary for generating support as a presidential candidate. Instead, he has concluded that recruiting volunteers would be "an exercise in futility," and that raising sufficient funds to pay petition collectors would be "wholly impracticable." (*Id.* at 2.) Plaintiffs offered no evidence at all regarding Mr. Buscemi's campaign, leaving Defendant to conclude that, like Mr. Kopitke, Mr. Buscemi has decided instead "to litigate to achieve [his] desired end, a place on the ballot." *Nader 2000*, No. 5:00-CV-348-BR3, at 11.

Public records, likewise, do not demonstrate any effort among Plaintiffs to comply with the Unaffiliated Candidate Petition Law. Those records show that Mr. Kopitke notified the Board of his petition campaign in June 2019, and that Mr. Buscemi notified the Board of his campaign in April 2019. (Love Decl. ¶¶ 6–7 & Exs. C, D.) But in the months since these notifications, Plaintiffs have apparently not delivered any petition signatures for review, based on the State Board's records. *See id.* Exs. C, D. This is particularly curious for Mr. Kopitke, who, according to public filings with the FEC, attempted to run for president in 2016. *Id.* Ex. E. He therefore was likely aware of the petition requirements to run for office in the various states. And even though North Carolina permitted him to begin his 2020 signature campaign as early as November 2016, he apparently did not initiate that campaign until June 2019. Defendant has been unable to locate any FEC filings for Mr. Buscemi, which raises further questions about his seriousness as candidate.

16

Plaintiffs' other declarant, Mr. Winger, suggests that North Carolina's ballot requirements are particular burdensome. First, his evidence does not indicate that North Carolina is an outlier when it comes to unaffiliated candidates' access to the ballot. (*See* Doc. 14-2 (displaying numerous states where unaffiliated candidates have rarely qualified during the time period studied)). But even more critically, Plaintiffs offer no evidence that they would be able to qualify under <u>any</u> state's rules. Mr. Kopitke is running for President of the United States, yet he has presented no evidence that he has been able to qualify in a single state or territory.

On the record presented, therefore, any irreparable harm to Plaintiffs cannot be attributed to North Carolina's "modest" ballot access laws. *Pisano*, 743 F.3d at 935. Instead, the harm is a result of Plaintiffs' apparent decision to litigate to achieve ballot access, rather than put in the work to campaign.

### III. THE EQUITIES AND THE PUBLIC INTEREST FAVOR MAINTAINING ORDER IN THE GENERAL ELECTION AND UPHOLDING STATE LAW.

The State of North Carolina would be subjected to significant harm if the requested injunctive relief is granted, which also would contravene the public interest.

Defendant Bell, as the chief elections official for the State, *see* N.C. Gen. Stat. § 163A-6(d), represents the public interest in this case, since the State's laws that Ms. Bell enforces reflect the public's interest. *Jackson v. Leake*, 476 F. Supp. 2d 515, 530 (E.D.N.C. 2006), *aff'd sub nom. N.C. Right To Life Comm. Fund For Indep. Political Expenditures v. Leake*, 524 F.3d 427 (4th Cir. 2008). Where the defendant represents the public interest, "consideration of the harm to them should the injunction issue merges with consideration of the public interest." *Id.*

In this case, the public interest demands that no injunctive relief be allowed, particularly on at this stage and on this bare record. A state has "not only an interest, but also a duty to

17

ensure that the electoral process produces order rather than chaos." *Libertarian Party v. Rednour*, 108 F.3d 768, 774 (7th Cir.), *cert. denied*, 522 U.S. 858, 139 L. Ed. 2d 103 (1997). Accordingly, the State of North Carolina has an indisputable interest in preventing a laundry list of candidates, minimizing voter confusion, discouraging frivolous candidates, and promoting orderly elections. *See Jenness v. Fortson*, 403 U.S. 431, 442 (1971) ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.") The requirements of the Unaffiliated Candidate Petition Law reflect the State's effort to ensure that candidates demonstrate "a significant modicum of support" before the name of an unaffiliated candidate can be placed on the ballot, as discussed more thoroughly in Defendant's Motion to Dismiss brief. (Doc. 25 at 20–23.)

Plaintiffs ask this Court to ignore the public interest in requiring candidates to show of a "significant modicum of support" by simply striking the Unaffiliated Candidate Petition Law and placing Mr. Kopitke's and Mr. Buscemi's names on the ballot. They seek this relief without offering <u>any</u> basis for determining that these candidates have wider support than any other potential unaffiliated candidate that might want to appear on the ballot next November. To grant such relief would thwart the State's "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot." *Munro v. Socialist Workers Party*, 479 U.S. 189, 194 (1986) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788–789, n.9 (1983)); *see Jones v. McGuffage*, 921 F. Supp. 2d 888, 902 (N.D. Ill. 2013) (holding that a remedy that placed a candidate on the ballot with no showing of support "would fly in the face" of the Supreme Court's instructions on the States' compelling interests). If Plaintiffs are

18

placed on the ballot without being required to make any showing of support, then any would-be unaffiliated candidate for any office who makes a request of the State Board can claim the same access. Or such candidates would seek the same relief by simply filing a federal complaint.

Without the reasonable restrictions on ballot access imposed by the Unaffiliated Candidate Petition Law, the State would be faced with exactly the sort of voter confusion, ballot overcrowding, or frivolous candidacies from which the Supreme Court has said states are entitled to protect their voting process. Accordingly, the balance of equities and public interest weigh strongly against the issuance of an injunction.

## CONCLUSION

For the foregoing reasons, Plaintiffs are not entitled to either preliminary or permanent injunctive relief, and the Motion should be denied.

This the 1st day of October, 2019.

>JOSHUA H. STEIN
>Attorney General
>
>/s/ Paul M. Cox
>Paul M. Cox
>N.C. State Bar No. 49146
>Special Deputy Attorney General
>N.C. Dept. of Justice
>Post Office Box 629
>Raleigh, NC 27602
>Telephone: (919) 716-6900
>Facsimile: (919) 716-6920
>Email: pcox@ncdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that on this date I electronically filed the foregoing document with the clerk of Court using the CM/ECF system which will send notification of such to all counsel of record in this matter.

This the 1st day of October, 2019.

/s/ Paul M. Cox
Paul M. Cox
Special Deputy Attorney General